IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 21 CR 618-6 |
| | ) | Hon. Martha M. Pacold |
| RALPH TURPIN, | ) | |
| | ) | |
| Defendant. | ) | |

RALPH TURPIN'S RULE 29 MOTION FOR A JUDGMENT OF
ACQUITTAL OR IN THE ALTERNATIVE A NEW TRIAL

Now Comes Defendant RALPH TURPIN, through his counsel JOSHUA B. ADAMS and PATRICK E. BOYLE, pursuant to Rules 29(c) and 33 of the Federal Rules of Criminal Procedure, moves this Court for a judgment of acquittal on Counts One and Three of the superseding indictment. In support of his motion, Mr. Turpin states the following.

I. Motion for Judgment of Acquittal Pursuant to Rule 29(c)

1. Legal Standard

   a. Rule 29

Rule 29 provides that "after viewing the evidence in the light most favorable to the United States, the trial court finds that no reasonable trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). While this is a heavy

1

burden, the verdict of a properly instructed jury is not sacrosanct. *United States v. Radomski*, 473 F.3d 728 (7th Cir. 2007).

As the Supreme Court has observed, "a properly instructed jury may occasionally convict even when it can be said that no rational trier of fact could find guilt beyond a reasonable doubt." *Jackson*, 443 U.S. at 318. A defendant challenging the sufficiency of the evidence of his guilt is "not required…to demonstrate that no evidence at all supports the conviction," but rather, only that the evidence does not support guilt beyond a reasonable doubt. *United States v. Rahman*, 34 F.3d 1331, 1337 (7th Cir. 1994). For the following reasons, Mr. Turpin argues that the government presented insufficient evidence to support the jury's guilty verdicts on Counts One and Three.

b. Rule 33

A motion for a new trial may be granted and a judgment vacated under Federal Rule of Criminal Procedure 33 "if the interest of justice so requires." Under this standard, trial courts are given wide discretion to make that determination. *United States v. Maclin*, 915 F.3d 440, 444 (7th Cir. 2019). Upon reviewing the evidence at trial, a new trial should be granted in cases where a "reasonable possibility" exists that an identified "trial error had a prejudicial effect on the jury's verdict." *Id*. The trial court

2

is entitled to "weigh the evidence and in so doing evaluate for itself the credibility of witnesses." *United States v. Sanchez*, 969 F.2d 1409, 1413 (2d Cir. 1992).

Moreover, "if the complete record . . . leaves a strong doubt as to the defendant's guilt, even though not so strong a doubt as to require a judgment of acquittal, the district court may be obliged to grant a new trial." *United States v. Morales*, 910 F.2d 467, 468 (7th Cir. 1990); *United States v. Reed*, 875 F.2d 107, 114 (7th Cir. 1989) (indicating that a new trial is warranted "where the evidence preponderates so heavily against the verdict that it would be a manifest injustice to let the guilty verdict stand"). In short, a motion for a new trial may be granted if a trial error contributed to an unfair outcome or if the totality of the evidence leaves doubt regarding the defendant's guilt of the charged offenses. With these principles in mind, we turn to Mr. Turpin's motions.

II. *The Government's comment about Mr. Turpin's right to remain silent at closing requires a new trial.*

A. Legal Principles

In its rebuttal, the government stated:

"I'll point out, Mr. Boyle, Mr. Adams, they don't have a burden to prove a single thing in this case, but they do have the subpoena power. They could have called witnesses. They could have called them if it was so important for you to hear from these people. I wanted you to hear from Ralph Turpin."

3

Tr. 10229. Following a defense objection to this improper argument, a sidebar was held. At sidebar the government claimed this statement referenced the video recording of Mr. Turpin at Monclear. Tr. 10230. However, the timing of this argument, coupled with the fact that it came right after the government told the jury that Mr. Turpin could subpoena witnesses, had a devastating effect on Mr. Turpin's Fifth Amendment right to remain silent.

It is well accepted that a criminal defendant may choose to remain silent and is not required to testify. "The corollary of that protection is that a prosecutor may not make comments, either directly or indirectly, that invite the jury to infer guilt from the defendant's decision not to testify." *United States v. Carswell*, 996 F.3d 785, 796 (7th Cir. 2021); citing *Griffin v. California*, 380 U.S. 609, 615, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965); *Tucker*, 714 F.3d at 1014.

"To evaluate such claims of prosecutorial misconduct, we first determine whether the remarks by the prosecutor were improper when viewed in isolation. *United States v. Common*, 818 F.3d 323, 331 (7th Cir. 2016). If not, the analysis ends there and the defendant's claim fails. *United States v. Love*, 336 F.3d 643, 647 (7th Cir. 2003). If any remarks were

4

improper, we would evaluate them in light of the entire record and determine whether they deprived the defendant of a fair trial. *Common*, 818 F.3d at 331. We would consider: (i) whether the prosecutor misstated the evidence; (ii) whether the remark implicated the specific rights of the accused; (iii) whether the defense invited the response; (iv) the effect of any curative instructions; (v) the defendant's opportunity to rebut; and (vi) the weight of the evidence. *United States v. Hale*, 448 F.3d 971, 986 (7th Cir. 2006); *Love*, 336 F.3d at 647–48. The weight of the evidence is by far the most important factor. *Love*, 336 F.3d at 648." *Carswell*, 996 F.3d at 795-96.

"A prosecutor violates the Fifth Amendment by commenting directly and adversely on the defendant's failure to testify on his own behalf." *Carswell*, 996 F.3d at 797; citing *United States v. Hills*, 618 F.3d 619, 640 (7th Cir. 2010)." Where a prosecutor indirectly comments on the defendant's failure to testify, such a comment will be deemed improper only if the prosecutor's "manifest intent" was to use the defendant's silence as evidence of guilt, or if the jury would "naturally and necessarily" infer guilt from the comment. *Id.*; *United States v. Mietus*, 237 F.3d 866, 871 (7th Cir. 2001). With these principles in mind, we turn to Mr. Turpin's Motion for a Judgment of Acquittal.

5

B. The Government's Rebuttal argument violated Mr. Turpin's Fifth Amendment Rights

In turning to the factors enumerated in *Carswell*, first the government in fact misstated the evidence. At sidebar, the AUSA stated he had meant the video recording of Mr. Turpin on his cell phone at Monclar. However, that is explicitly not what he told the jury. He could have told the jury he wanted them to see Exhibit XX, or specifically mention the Monclar video; something the government referenced dozens of times during its case in chief. Rather, the AUSA selected the specific words that he wanted the jury to "hear from Mr. Turpin."

Second, these remarks undoubtedly and unmistakenly implicated Mr. Turpin's right to remain silent. As in the first factor, the government could have easily referenced the exhibit admitted into evidence. It could have played the video. But to specifically say "I wanted *you* to hear from Ralph Turpin" is a direct comment on Mr. Turpin's Fifth Amendment right to remain silent. The AUSA made this statement right after he told the jury that Mr. Turpin's counsel had subpoena power and could call defense witnesses thereby improperly inviting the jury to speculate as to why Mr. Turpin was called to give his version of the events to the jury.

Third, Mr. Turpin never invited the government's comment. In closing, Mr. Turpin told the jury that the government has the burden, and the jury

6

deserved to hear from the individual the government called "Bad Ass." Never did Mr. Turpin's counsel mention that he did not have to testify.

The government made these statements in its rebuttal, where it has the final word. Mr. Turpin never had a chance to respond. While the jury instruction does say that no negative inference may be drawn from the defendant's refusal to testify, the prosecutor's improper argument is a highly prejudicial bell that cannot be unrung.

The Seventh Circuit has found that indirect commentary on the accused's right to remain silent violate the Fifth Amendment "only when it is highly unlikely that anyone other than the defendant could rebut the evidence." *United States v. Cotnam*, 88 F.3d 487, 497(7th Cir. 1996). The evidence against Mr. Turpin relied exclusively on the video recording taken inside Moncler, and the video of Ralph running along Oak Street before *and* after the shooting. Surely, Mr. Turpin is the only person who could rebut the government's allegations as to who he called prior to the Moncler video, or what occurred once Mr. Dent left Milani.

Furthermore, the phone records did not cite any call or "data package" as the agent testified to that would demonstrate Mr. Turpin used his phone while he and Mr. Weekly were in Milani together. Put another way, the evidence tying Mr. Turpin to the government's theory that he called in Mr. Weekly's location was scant.

7

III. The District Court erred when it overruled Mr. Turpin's objection to Government Instruction 45.

    1. Government Instruction 45 on aiding and abetting unfairly prejudiced Mr. Turpin.[1]

The Government's theory of this case had been that the jury could find any of the defendants guilty if that individual aided and abetted the conspiracy. Indeed, the government charged 18 USC §2 against all defendants in this case, not just Ralph Turpin.

The federal aiding-and-abetting statute "does not create a separate offense." *United States v. Galiffa*, 734 F.2d 306, 312 (7th Cir. 1984). "It simply makes those who aided and abetted a crime punishable as principals." *Id.* Accordingly, "an indictment need not charge [aiding or abetting] separately. Aiding or abetting is a proper basis of conviction in every prosecution." *United States v. Newman*, 755 F.3d 543, 545 (7th Cir. 2014).

Each defendant could have been found guilty under an aiding and abetting theory of liability. The Government's proposed instruction 45 specifically separates Mr. Turpin from the rest of the defendants. This is something the government did not do for Count 1, despite arguing the same

---

[1] Pattern instruction 5.06(a)-(b)

8

basis for liability: aiding and abetting. As Mr. Turpin argued at the instruction conference, carving out a specific instruction solely for Mr. Turpin, when each defendant could have been found guilty under the same theory puts an improper spotlight on Mr. Turpin.

Moreover, Mr. Turpin is not charged separately in Count Three, with the conspiracy to commit murder. Any of the defendants could have been found guilty under this theory if the jury did not believe a certain defendant discharged a firearm. For example, the government did not allege that Roberson fired a gun. Rather, according to the government's theory, Roberson aided and abetted the conspiracy by driving the shooters. There is no separate jury instruction for him on either the VICAR murder in Count One or conspiracy in Count Three. By singling Mr. Turpin out, it not only confuses the issues for the jury, but it also unfairly places a spotlight on Mr. Turpin. If he is charged together with the other defendants, it is wholly improper and prejudicial for the government to request a jury instruction that does just the opposite.

IV. The Government failed to prove Mr. Turpin guilty beyond a reasonable doubt in Counts 1 and 3.

    1. The government failed to prove Mr. Turpin aided and abetted the substantive VICAR murder in Count 1.

        a. Jury Instructions

The government proceeded on an aiding and abetting theory of liability for Mr. Turpin as to the substantive VICAR murder in Count 1. In order to convict Mr. Turpin, the government had to prove that:

1. O-Block street gang was an enterprise;
2. The enterprise was engaged in racketeering activity.
3. The activities of the enterprise affected interstate commerce;
4. The defendant you are considering committed the murder of Carlton Weekly in violation of Illinois law;
5. The defendant you are considering committed the murder of Carlton Weekly for the purposes of maintaining or increasing his position in the enterprise.

R. 56 at p. 27. Furthermore, the court gave the Accountability for Murder instruction that stated "Under Illinois law a person is legally responsible for the conduct of another, either before or during the commission of the offense, and with the intent to promote or facilitate the commission of the offense he . . . aids, abets, agreed to aid or attempts to aid the other person in the planning or commission of the offense." R. 56 at p. 30.

However, the evidence introduced at trial failed to prove these elements beyond a reasonable doubt. Specifically, the government failed to prove that Mr. Turpin aided or abetted the murder of Mr. Weekly, or that he did so in order to maintain or increase his position in the O-Block enterprise.

10

    b.    The government did not prove Mr. Turpin aided or abetted the O-Block enterprise with the goal of maintaining or increasing his own position.

The bulk of the government's evidence to establish the five elements in the VICAR instruction, and for its accountability instruction was the Oak Street compilation, Ex.\_\_\_\_, and Mr. Turpin's phone call in Moncler. Ex.\_\_\_.

However, during opening statements, the government told the jury that "While inside Milani, Turpin placed a call. He provided Duck's location to others." Tr. 3031. But the evidence at trial did not bear this out. Agent Doyle testified about Mr. Turpin's toll records in Exhibit 800-1 and 800-2. These records had all the inbound and outbound calls for Mr. Turpin's phone number and focused on August 2, 2020.

Of particular note, there are no calls, inbound or outbound, from Mr. Turpin's phone during the few minutes he and Mr. Weekly were in Milani together. The government showed the Oak Street compilation video that showed Mr. Weekly and Mr. Turpin walking into and out of Milani. The phone records do not corroborate the government's allegation that Mr. Turpin made the alleged call while he was "inside Milani." And if that is the government's theory of how Mr. Turpin aided and abetted O-Block, then it failed to meet its burden. Mr. Turpin unequivocally did not make a phone call while he was in Milani with Weekly.

11

Second, the government proceeded on an aiding and abetting theory based on this notion that certain gangs were "clicked up" with O-Block. However, besides general statements by witnesses like David Sloan, there was no substantive evidence that Mr. Turpin either gave Mr. Weekly's location to anyone affiliated with O-Block, or that he did so in order to enhance his own standing in this "cliqued up" group of affiliated gangs. *See* Tr.5389-90 (Sloan, direct).

    c. The Government's evidence was insufficient to prove an agreement to join a conspiracy

In order to bolster Sloan's statement some of the gangs assisted one another through something called an "alley-oop," the government called several witnesses who knew Mr. Turpin. For example, Adonnis Dent testified that he had been a member of "Fifth Ward." TR. 7964. That faction was part of the GDs. *Id.* The Government asked Mr. Dent if Ralph Turpin was a member of a gang, and the prosecutor asked, "when he was in Fifth Ward." *Id.* Mr. Dent testified that "You are saying 'in Fifth Ward." I said he was in with us. I ain't never say he was affiliated." *Id.* The government proceeded to show Mr. Dent his grand jury testimony, where he stated that Ralph was part of Fifth Ward. Tr. 7970.

The government further showed Mr. Dent photos of individuals with Mr. Turpin and asked if he could identify them. *Id*. Mr. Dent identified Crack and D Thang as people they "all grew up together." *Id*.

On cross-examination, Mr. Dent testified that he did not know anybody that wanted to kill Duck." Tr. 8008. Mr. Dent and Mr. Turpin had been in Milani with Duck. Mr. Dent stated he did not see Mr. Turpin holding a phone while in the store, nor did he and Mr. Weekly have any interaction whatsoever. Tr. 8009.

Cashell Williams also testified for the government. Tr. 8033. Mr. Williams and Ralph grew up together. He testified that Mr. Turpin was from the Fifth Ward. When asked if he was a BD, Mr. Williams responded, "yeah." Tr. 8038. Mr. Williams also testified that Mr. Turpin had one conversation about Mr. Weekly dating Mr. Turpin's ex-girlfriend. He stated that Ralph "just mentioned it once." Tr. 8044. When asked if "Turpin said to you at least once that he didn't like Duck messing with his baby mama," Mr. Williams stated, "he didn't even say that." Tr. 8044. He further added that it was not like Ralph was "mad or like he was happy." *Id*.

When asked about the photo of Mr. Turpin wearing the OTF necklace, Mr. Williams stated that was just "fan stuff." Tr. 8060. He explained that that is like a fan of this person's music or he a entertainer." *Id*. Mr. Williams added that "it's just for entertainment, for social media. Tr. 8061. The

13

government asked Mr. Williams about pictures of Crack with Mr. Turpin and Crack's affiliation.

Dorian Hollie also testified about historical affiliations with Fifth Ward and Ralph's relationship. Tr. 8083. Mr. Hollie testified that most members of Fifth Ward are older and do not participate in gang activity. Tr. 8084-85. Mr. Hollie knew Ralph because they grew up together; he knows Ralph's entire family. Tr. 8089. Just like the other witnesses, the government showed Mr. Hollie pictures of Mr. Dent and "Crack" and asked about their gang affiliation.

At no point in any of the government's case in chief did it attempt to tie in this idea of an "alley-oop" specifically with respect to Ralph and Mr. Weekly. It merely made references to gangs and gang membership. But not a single witness testified that Ralph had intended to aid and abet the Black Disciples by telling a specific faction about Mr. Weekly's location.

In fact, the evidence showed that Mr. Turpin had zero interaction and no conflict with Mr. Weekly. They even saw each other in Milani, and the two men did not exchange words. The government failed to establish that Mr. Turpin agreed to join any conspiracy for the purposes of aiding and abetting the larger Black Disciple street gang. Mere affiliation with these gangs does not create a strict liability for Mr. Turpin.

14

Perhaps even more glaring, during Agent Case's testimony, she was asked "the answer is you don't have a single text message from Ralph Turpin to anyone here, right?" She answered "yes." Tr. 8342.

CONCLUSION

Therefore, based on the foregoing, Mr. Turpin respectfully requests this honorable court grant his motion for judgment of acquittal, or in the alternative order a new trial.

/s/Joshua B. Adams
Counsel for Ralph Turpin

Joshua B. Adams
LAW OFFICES OF JOSHUA B. ADAMS, P.C.
900 W. Jackson Blvd, Suite 7E
Chicago, IL 60607
(312) 566-9173

Patrick E. Boyle

LAW OFFICES OF PATRICK E. BOYLE
155 North Michigan Ave., Suite 562
Chicago, IL 60601
(312) 565-2888